UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 11-23559-CIV-MORENO/DUBÉ

MARIA OLGA OSTOS,

       Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before this Court on the Motion for Summary Judgment filed by the Plaintiff (D.E. #21) and the Motion for Summary Judgment filed by the Defendant (D.E. #24) pursuant to a Clerk's Notice of Magistrate Judge Assignment entered by the Clerk of Court, United States District Court for the Southern District of Florida. The issue before the Court is whether the record contains substantial evidence to support the denial of benefits to the Plaintiff, Maria Olga Ostos (hereinafter "Ostos" or "Plaintiff").

### I. FACTS

Ostos filed an application for supplemental security income on November 6, 2008, which asserted disability as of November 6, 2008. (R. 153-159).[1] The application was denied initially and on reconsideration. (R. 85-90, 99-101). Thereafter, a hearing was held on January 5, 2011 (38-84). After the hearing, the ALJ issued a decision finding the Plaintiff not disabled. (R. 15-37). A request for review filed with the Appeals Council was denied. (R. 1-6).

_____

1. All references are to the record of the administrative proceeding filed as part of the Defendant's answer.

The Plaintiff, age 62 at the time of the hearing on January 5, 2011, testified through an interpreter that she attended school through the fifth grade in Colombia and lived in the United States for approximately 15 years. (R. 40-42). Ostos asserted she could not read, write or speak English and while she had been in the United States she had worked in a factory and cleaned houses. (R. 42).

According to Ostos, she cleaned houses for two years but not on a daily basis. The Plaintiff further testified she worked in "factory-related" work for 10 years. (R. 42). Ostos claimed she had problems working due to her character "because of [her] nervous crisis, lack of concentration, [and] headaches." The Plaintiff further claimed she consistently had problems with other employees and as a result, she was fired. Ostos stated she had not worked in three years. (R. 43). Specifically, the Plaintiff asserted she had worked as a sewing machine operator, which required her to lift and carry rolls of fabric that she needed to use for sewing. (R. 43-44).

The Plaintiff testified she lived with her 25 year old son who did all of the cooking, cleaning, laundry and food shopping, but she occasionally helped put the sheets on the bed. Ostos asserted she spent most of the morning in bed because she got headaches and also suffered from the side effects of her medication. The Plaintiff further asserted she experienced constant migraines, a lack of concentration, and fainting spells. (R. 44). Ostos claimed the side effects from her medication included nausea, an increase in headaches, weakness and loss of appetite. (R. 45).

Additionally, the Plaintiff testified her son paid the rent. With regard to her limitations, the Plaintiff asserted she could lift a one-gallon jug of milk with both hands and was unable to complete tasks at home in a timely duration due to her inability to remember what she was doing. Ostos gave the example that when she walked to the bathroom to brush her teeth, by the time she reached the bathroom she had forgotten why she was there. (R. 45).

According to the Plaintiff, when she was around other people she did not feel well and did

not like to have friends or go out because she felt as though someone was following her. (R. 45). Ostos asserted she experienced panic attacks between one to three per month that lasted for five hours.  The Plaintiff testified she had fainted in December of the previous year and when she was alone and experienced a panic attack, she called the paramedics who administer oxygen.  The Plaintiff testified she had called the paramedics twice in a six-month period. (R. 46).

Ostos testified she would drive but only when her son was unavailable to drive her.  The Plaintiff asserted she did not drive more often because she did not like it due to her frequent fainting spells. (R. 46).  The Plaintiff testified she was a United States citizen and speculated she became a citizen 5 years prior to the hearing.  Ostos asserted she was treated by a physician every month or two months at New Horizons for mental health medical treatment.  The Plaintiff stated her son was a military veteran who received benefits from the government and also worked part-time. (R. 47). The Plaintiff claimed she arrived at her attorney's office via the metrorail and sometimes her son would take her to doctor's appointments. (R. 48).

Dr. Oscar Farmati testified at the hearing as a medical expert (hereinafter "Ostos" or "ME"). (R. 48).  The Plaintiff testified she was still taking clonazepam for sleeping, klonopin, amitriptyline, and nexium. (R. 50-51).  Farmati opined that the physical exams contained in the available record were "essentially negative" or normal.  According to the ME, the exception was Exhibit 10 dated 2010. (R. 53).  The ME noted there was no EEG exam in the record, but there was evidence of two impairments, specifically, a "mental issue" and "chronic headaches." (R. 53-54).

Farmati testified that while the Plaintiff labeled her headaches as migraines, due to the duration of her headaches, in his opinion, they were not migraines.  The ME testified migraines can be caused by many things and the headaches were vascular headaches due to Ostos' growing depression. (R. 54).  Further, the ME testified the Plaintiff had no physical impairments. (R. 54).

3

The ME provided testimony regarding Listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders). Farmati stated he found documentation contained in the record that demonstrated the Plaintiff had mental issues that ranged from depression to anxiety. (R. 54). The ME further opined that with regard to Listing 12.04 there was evidence of depressive symptoms; psychomotor agitation; decreased need for sleep; marked restriction of activities of daily living; difficulties maintaining social functioning; and marked difficulties in maintain concentration, persistence and pace. (R. 54). With regard to the impairments associated with anxiety disorder, the ME testified the Plaintiff exhibited vigilance and scanning; marked restrictions on activities of daily living; maintaining social functioning; and difficulties in concentration, persistence and pace. (R. 55).

Dr. Farmati testified regarding the exhibit which had him question the existence of migraines and consider persistent chronic headaches was Exhibit 10 for 2010. The MRI documented "white matter changes in the brain with small vessel changes and small vessel changes." The ME testified the Plaintiff had never tolerated anti-migraine medications and this was one of the reasons he opined that a diagnosis of migraines could be excluded. The ME further opined that the Plaintiff was able to tolerate antidepressants and mood modifying medications. Farmati stated the pain that was associated with the Plaintiff's headaches was related to eating and emotional stress. (R. 55).

Farmati testified that the Plaintiff showed improvement with the passage of time with fluctuations of remaining calm and anxiety reactions. The ME opined that he was not able to ascertain why she had been prescribed Singulair to which the Plaintiff asserted she had allergies associated with her body and eyes. (R. 57).

The ME indicated the Plaintiff had experienced a severe anxiety attack in 2009, resulting in the assistance of the fire department. The ME testified during that time the Plaintiff had not been

4

using a typical anti-migraine medication and in at least one document, a physician indicated Ostos had been over-using Advil for her headaches. The remainder of the physical exams, the ME opined, were normal including myelograms of the lower extremities, an aortogram, and a pelvic exam with no evidence of peripheral vascular disease. Additionally, Farmati testified the Plaintiff's pancreas, spleen and liver were normal, she was HIV negative and there was mild dyslipidemia or elevation of cholesterol. (R. 58).

Additionally, Farmati testified there was no evidence of lupus. (R. 58). Farmati considered an MRI of white matter changes and small vessel disease in the gray cortex, and opined that there was no evidence of severe hypertension but noted the Plaintiff was using atenolol. The ME concluded that the anti-depressants were helping the Plaintiff's general condition and there was no evidence of medical emergencies for her headaches. (R. 59).

According to the ME, the evidence of depression was documented "quite widely" in the record with the anxiety reaction. The ME further opined that there was no evidence to indicate severity. Farmati testified that the MRI may have explained the Plaintiff's headaches, and further opined Ostos probably had hypertension that went untreated and caused white matter changes in her brain, indicating small vessel disease. The ME stated the only evidence of headaches was chronic depression, which was a "fairly common occurrence." Further, the ME testified that there was no EEG in the record "which can be sometimes very demonstrative for headache[s], for migraine[s]." (R. 59).

Farmati testified he did not say that the Plaintiff met or equaled Listings 12.04 or 12.06, but stated he had previously identified medical records that were to be considered by him as a medical expert and by the ALJ. The ME opined he "blame[d]" her headaches on the white matter changes in her brain documented in October 2009. The ME further reiterated Ostos' physical exams were

5

within normal limits but there was evidence of depression, anxiety, low concentration, and mildly anti-socialization and memory loss. (R. 60).  Farmati opined that the memory loss could be connected to the white matter changes in the brain noting that the MRI was the only objective piece of medical evidence regarding the central nervous system that was contained in the record. (R. 61).

The ME testified he could not state that the Plaintiff was disabled and unable to work from "any kind of work," stating Ostos was not disabled from generalized kinds of work. Farmati testified that in his opinion the Plaintiff was unable to do medium exertion level work; meaning she was unable to lift 50 pounds occasionally and 25 pounds frequently; with standing and walking 6 hours in an 8 hour workday. (R. 61).  However, the ME opined that the Plaintiff was capable of performing light exertional work; meaning she was capable of lifting 20 pounds occasionally and 10 pounds frequently and during the day she was capable of sitting for 2 hours and standing 6 hours in an 8 hour workday. (R. 62).

The ME testified he had never examined the Plaintiff.  Further, the ME asserted that while the medical record referenced severe migraine headaches there was no documentation that the Plaintiff suffered from migraines. (R. 62).  Counsel for the Plaintiff noted Dr. Staszel found that the Plaintiff could only lift 3 pounds to which the ME asserted that the clinical exam performed in 2009 (Exhibit 6-F) was within normal limits. (R. 63).

According to the ME, the Plaintiff had a slightly antisocial attitude and would "probably not" be able to respond appropriately to supervisors and co-workers in a work setting. (R. 64).  Farmati testified that the medical evidence indicated the Plaintiff suffered from anxiety and panic attacks. (R. 66).

Counsel for the Plaintiff inquired about the different GAF scores contained in the record. The ME testified that one could not find two reporting physicians or professionals with the same

opinion on mental issues and therefore averages were taken.  The ME testified that if a person had a GAF score of 40 or 45 he/she may be capable of doing work, depending on the type of work he/she would be doing, but declined to opine to the type of work that a person with a GAF score of 40 or 45 would do because he was not a vocational expert. (R. 68).

With regard to the Plaintiff's headaches, the ME testified the Plaintiff had headaches on a monthly basis noted as status epilepticus or status migraine. Farmati further stated the migraine itself was only a clinical impression and was never documented and "a simple EEG would change the whole documentation." The ME stated he did not deny or confirm the presence of the Plaintiff's headaches but merely opined that he read the records, and the records showed she visited the hospital complaining of headaches. The ME testified the medical evidence indicated the Plaintiff had chronic headaches. (R. 69).

Farmati testified that in his opinion someone with chronic headaches may be capable of employment, depending on the kind of work he/she would be doing. (R. 69).  The ME also testified that on days that Ostos was not doing well she would probably not be able to work. (R. 70).  Farmati stated that Exhibits 11-F and 2-F reveal the Plaintiff decompensated under stress, but her stress capability was moderate and attributed it to depression because "the depression is unable to sustain stress." (R. 71).

Counsel for the Plaintiff stated for the record that the question that would have been posed to the ME was whether someone who decompensates under stress was employable. (R. 72).  The ALJ stated that the question was a vocational question and asked counsel to save the question for the vocational expert. (R. 72-73).  According to the ME, he disputed the physician's statement in Exhibit 11-F which states that the Plaintiff had poor abilities to follow work rules, relate to co-workers, deal with the public,  interact with supervisors, and deal with work stressors and maintain

attention and concentration. (R. 73-74).

Counsel for the Plaintiff asked the ME if he had found anything in the medical record that contradicted the physician's opinion in Exhibit 11-F that the Plaintiff had a poor ability to understand, remember, and carry out complex job instructions or detailed but not complex job instructions. The ME stated he agreed with the assessment. Next, counsel for the Plaintiff further asked if Farmati agreed with the assessment of the Plaintiff that she had a poor ability to behave in an emotionally stable manner, relate predictably to social situations and demonstrate reliability. (R. 74). Farmati responded as follows: "I never dispute anybody's opinion. I have my own." (R. 75).

The ALJ informed counsel that the doctor had testified to his opinion of the record and she would weigh the physician's opinion as well as every other opinion in evaluating the Plaintiff's claim. Counsel for the Plaintiff stated that the cross-examination of the ME had been cut and counsel had been prevented from continuing to question Farmati about the evidence in the case. (R. 75).

Additionally, Ms. Jeanine M. Salek testified at the hearing as a vocational expert (hereinafter "Salek" or "VE"). (R. 76). The VE stated she was familiar with the various source documents concerning job information listed in the regulations as well as the jobs that existed where the Plaintiff lived. The VE identified the region in which the Plaintiff lived as Miami-Dade, Broward, and Palm Beach counties. (R. 77). Salek testified she was familiar with vocations through her work as a case manager at a rehabilitation center, a vocational expert and through publications by the U.S. Department of Labor. (R. 77-78).

The VE testified the Plaintiff worked as a sewing machine operator, DOT #787.682-066,

SVP 3, semi-skilled, light work.[2]  The Plaintiff's past work also included work as a housekeeper,

cleaning houses, DOT #323.687-014, SVP 2, light work.  The VE testified that was all the work

Ostos had performed within the previous 15 years. (R. 78).  The VE further testified that the work

the Plaintiff had performed in the factory was work as a sewing machine operator, and lifting bulk

cloth was consistent with work performed as a sewing machine operator.

> Thereafter the ALJ asked Salek the following hypothetical:

> > Assume a hypothetical claimant of the same age, education and work experience as this claimant.  Also assume that such a hypothetical claimant has no reported exertional limitations.  However, because of the history of headaches, such a hypothetical claimant should avoid unprotected heights, including ladders, ropes and scaffolds.

> > Also assume that mentally such a hypothetical claimant can perform the mental demands of unskilled work, that is can understand, remember and carry out short, simple instructions; respond appropriately to supervision; interact appropriately with co-workers and the public; respond appropriately to changes in a routine work setting.

> > Do you have an opinion as to whether such a hypothetical claimant could perform any of the claimant's past work?

(R. 78-79).  The VE opined the Plaintiff would be capable of returning to her work as a housekeeper

and stated even if such a hypothetical claimant were limited to light exertion work or medium work,

the result would be the same. (R. 79).

> The VE was asked to assume the following definitions by the ALJ: "unlimited" or "very

good" was defined as ability to function in this area is more than satisfactory.  "Good" was defined

as the ability to function in this area is limited, but satisfactory.  "Fair" was defined as the ability to

---

[2]Dictionary of Occupational Titles (4th ed. rev. 1991), details job descriptions within the United States workforce.  Contained within such definitions are the specific vocational preparation skills (SVP) defined as, "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT, Appendix C.

function in this area is seriously limited, but not precluded.  And "poor" or "none" was defined as no useful ability to function in this area. (R. 80).  The VE was asked to consider the second hypothetical question:

> Assuming those definition[s], the following are fair: use of judgment and function independently.  Assume a hypothetical claimant who has fair ability to use judgment and function independently.  Also... fair ability to understand, remember and carry out simple job instructions; fair ability to maintain personal appearance with, again, no exertional limitations except as those identified in the previous hypothetical.  Would such a hypothetical claimant be able to perform any of the claimant's work?

(R. 80).

Salek testified the hypothetical claimant would be able to perform work as a housekeeper.

(R. 80).  The ALJ asked the vocational expert a third hypothetical question:

> ... considering the definition[s] that were given in the prior hypothetical, assume such a hypothetical claimant had poor in the following areas, as defined.  Poor ability to follow work rules; to relate to co-workers; to deal with the public; interact with supervisors; deal work stresses; maintain attention and concentration; understand complex -- and remember and carry out complex job instructions; understand, remember and carry out detailed, but not complex job instructions; all those are poor.  Also, behave in an emotional stable manner, relate predictably to social situation[s] and demonstrate reliability.  Do you have an opinion as to whether such a hypothetical claimant could perform any of claimant's past work or any work in the economy?

(R. 80-81).

According to the VE, the hypothetical claimant would not be able to perform any of the Plaintiff's past relevant work because all work has some kind of stress.  The VE further provided examples of work stress that included following work rules, dealing with co-workers and supervisors, demonstrating emotional stability and reliability.  The VE testified there was nothing vocationally relevant that the ALJ had not addressed and the jobs identified by her were consistent

with the Dictionary of Occupational Titles. (R. 81).

Counsel for the Plaintiff asked that assuming the hypothetical claimant had panic attacks three times a month that lasted for several hours, would she be able to perform any of the jobs mentioned. The VE testified if the hypothetical claimant had panic attacks that lasted for several hours then she would not be able to maintain employment. Further, Salek asserted that if the hypothetical claimant missed more than three days a week for medical treatment then she would not be able to maintain a job. The VE stated that generally speaking one un-excused absence per month or occasionally two absences per month would be tolerated by employers. (R. 82). Salek reiterated that if the hypothetical claimant had a general inability to deal with work stress, then there would be no job that the claimant would be capable of performing because all jobs had stress. (R. 82-83).

In addition to the testimony presented at the hearing, medical records were submitted to the ALJ. However, a review of the medical records and the specific issues raised by the Plaintiff in her Motion for Summary Judgment shows the resolution of the issues do not require this Court to specifically set out all the medical evidence in detail. Accordingly, this Court will discuss the legal issues involved and will incorporate the facts as appropriate within the arguments presented below.

After a hearing and review of the record, the ALJ issued an opinion finding that the Plaintiff had the following severe impairments: generalized anxiety related disorder, panic disorder, major depressive disorder and migraine headaches. The ALJ found that the Plaintiff did not have an impairment or combination of impairments that meets or equals a listing. (R. 20). The ALJ further found the Plaintiff was capable of performing a full range of work at all exertional levels but with the following non-exertional limitations: avoid unprotected heights including ladders, ropes and scaffolds; the Plaintiff had moderate limitations in concentration as it related to complex and detailed tasks and was limited to the basic demands of unskilled work. (R. 22). The ALJ determined the

Plaintiff was capable of performing her past relevant work as a housekeeper, and the work did not require the performance of work related activities precluded by the Plaintiff's residual functional capacity. (R. 32).  The ALJ concluded that the Plaintiff had not been under a disability since September 12, 2008. (R. 33).

## II. <u>LEGAL ANALYSIS</u>

Judicial review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. section 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Kelley v. Apfel</u>, 185 F.3d 1211, 1213 (11th Cir. 1999); <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990).  "Substantial evidence" is more than a scintilla, but less than a preponderance and is generally defined as such relevant evidence which a reasonable mind would accept as adequate to support a conclusion. <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1440 (11th Cir. 1997).

In determining whether substantial evidence exists, the court must scrutinize the record in its entirety, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995);  <u>Lamb v. Bowen</u>, 847 F.2d 698, 701 (11th Cir. 1988).  The reviewing court must also be satisfied that the decision of the Commissioner correctly applied the appropriate legal standards. <u>See</u>, <u>Bridges v. Bowen</u>, 815 F.2d 622, 624 (11th Cir. 1987).  The court may not reweigh evidence or substitute its judgment for that of the ALJ, and even if the evidence preponderates against the Commissioner's decision, the reviewing court must affirm if the decision is supported by substantial evidence. <u>See</u>, <u>Barnes v. Sullivan</u>, 932 F.2d 1356, 1358 (11th Cir. 1991); <u>Baker v. Sullivan</u>, 880 F.2d 319, 321 (11th Cir. 1989).

The restrictive standard of review set out above applies only to findings of fact.  No presumption of validity attaches to the conclusions of law found by the Commissioner, including the

determination of the proper standard to be applied in reviewing claims. Brown v. Sullivan, 921 F.2d 1233, 1236 (11th Cir. 1991); Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). The failure by the Commissioner to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal. Cornelius v. Sullivan, 936 F.2d 1143, 1145-1146 (11th Cir. 1991); See also, Wiggins v. Schweiker, 679 F.2d 1387, 1389 (11th Cir. 1982).

Social Security regulations establish a five-step sequential analysis to arrive at a final determination of disability. See, 20 C.F.R. section 404.1520; 20 C.F.R. section 416.920 (a)-(f).

The ALJ must first determine whether the claimant is presently employed. If so, a finding of non-disability is made, and the inquiry ends. 20 C.F.R. section 404.1520(b). In the second step, the ALJ must determine whether the claimant suffers from a severe impairment or combination of impairments. If such a finding is not made, then a finding of non-disability results, and the inquiry ends. 20 C.F.R. section 404.1520(c).

At step three, the ALJ compares the claimant's severe impairments to those in the listing of impairments. 20 C.F.R. section 404.1520(d), subpart P, appendix I. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if such impairments are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work. See, Gibson v. Heckler, 762 F.2d 1516, 1518, n.1 (11th Cir. 1985). If the impairment meets or equals a listed impairment, disability is presumed, and benefits are awarded. 20 C.F.R. section 404.1520(d).

Step four involves a determination of whether the impairments prevent the claimant from performing his or her past relevant work. If the claimant cannot perform his or her past relevant work, then a prima facie case of disability is established and the burden of going forward with the

13

evidence shifts to the Commissioner to show, at step five, that there is other work available in the national economy which the claimant can perform. 20 C.F.R. section 404.1520(e)-(f).

The claimant bears the initial burden of proving that he is unable to perform previous work. See, Barnes v. Sullivan, 932 F.2d 1356, 1359 (11th Cir. 1991). The inability to perform previous work relates to the type of work performed, not to merely a specific prior job. See, Jackson v. Bowen, 801 F.2d 1291, 1293 (11th Cir. 1986).

The Plaintiff's first point of contention is that the Plaintiff's due process was violated during the hearing. Specifically, the Plaintiff contends the ALJ "cut off" and restricted counsel from cross-examination of the ME, Farmati. The Defendant argues the Plaintiff asked the ME vocational questions that were ultimately posed to the VE.

The Eleventh Circuit has addressed due process as it relates to a claim for disability benefits and found that "there must be a showing of prejudice before [the court] will find that the claimant's right to due process has been violated to such a degree that the case must be remanded to the Secretary for further development of the record." Gordon v. Astrue, 249 Fed. App'x 810, 813 (11th Cir.2007)(unpublished)(quoting Brown v. Shalala, 44 F.3d 931, 935 (11th Cir.1995).

In the instant cause, Ostos argues the ME did not render an opinion regarding whether she met or equaled the Listing requirements of 12.04 and 12.06. Ostos further contends that due to the absence of the answer to this particular question, counsel for Ostos attempted to conduct across-examination that was prematurely terminated by the ALJ.

Contrary to the Plaintiff's contention, the ME addressed his findings with regard to Listing 12.04 and 12.06 and further opined on the specific requirements contained within each Listing. Therefore, the Plaintiff's argument in this regard is without merit. (R. 54-55). Further, the Plaintiff argues that the Hearings, Appeals, and Litigation Law Manual ("HALLEX") sets forth rules for

14

obtaining the testimony of a medical expert, and since the ALJ violated the rules of the HALLEX by not allowing the Plaintiff to conclude her cross-examination of the ME, the Plaintiff's due process was violated.

The Hearings, Appeals, and Litigation Law Manual or HALLEX is a policy manual written by the Social Security Administration that provides policy and procedural guidelines for ALJs. Maiben v. Astrue, No. CA-090408-C, 2010 WL 761334, at * 4 (S.D.Ala. Mar. 4, 2010). In an unpublished case, the Eleventh Circuit addressed whether a claimant is entitled to remand upon the assertion that the ALJ deviated from the procedures set forth in the HALLEX. The Eleventh Circuit stated, in pertinent part, the following:

> We have held that the sixth sentence of § 405(g) "provides the *sole means* for a district court to remand to the Commissioner to consider new evidence presented for the first time in district court." Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1267 (11th Cir.2007)(emphasis added). HALLEX is an agency handbook for the SSA not mentioned in §405(g), so it cannot serve as the basis to remand Carroll's case. Moreover, we have held that an agency's violation of its own governing rules must result in prejudice before we will remand to the agency for compliance. See Hall v. Schweiker, 660 F.2d 116, 119 (5th Cir. Unit A Sept. 1981) (per curiam).[3]

Carroll v. Soc. Sec. Admin., Comm'r, 453 Fed. App'x 889, 892 (11th Cir. 2011)(unpublished).

In the instant case, while the Plaintiff cited to numerous HALLEX policies, there is no evidence that any alleged violation of the procedures resulted in prejudice to the Plaintiff. At the time of the hearing, the ALJ advised counsel to save any vocational questions to be considered for the VE. Counsel for the Plaintiff then asked the following question:

> ATTY: I want the record to be clear so that when we take the appeal, everybody will know what the issue was, and that is I wanted to ask him whether someone who decompensates under stress is

---

[3]Decisions of the prior Fifth Circuit handed down prior to October 1, 1981 are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981).

> employable, in his opinion, and you're telling me I can't ask him that question?
>
> ALJ: That's a vocational question.

(R. 72).

HALLEX I-2-5-39 states, "[a]n ALJ must not question an ME about any matter which is not within the ME's area of expertise and responsibility. For example, the ALJ must not ask an ME about vocational matters, or how the ALJ should decide the case." Here, the ALJ correctly found the question asked of the ME was vocational in nature and further instructed counsel for the Plaintiff to pose the question to the VE. (R. 73). Furthermore, additional questions posed to the ME specifically related to Ostos' impairments and limitations had previously been answered by the ME. For example, counsel for the Plaintiff asked the ME the following question:

> Q: Did you find any evidence in the medical records to dispute the doctor's contention that the claimant had poor ability to follow work rules; relate to co-workers; deal with the public; interact with [a] supervisor; deal with work stressors and maintain attention and concentration?

(R. 73).

The ME testified that he had previously stated his opinion regarding the Plaintiff's functional limitations and further reiterated that he had mentioned that in his opinion, he believed the Plaintiff had "more difficulties maintaining social functioning," (referencing his previous testimony that Ostos had marked difficulties in maintaining social functioning). (R. 54, 74,). Because the ME provided his opinion of the Plaintiff's medical conditions as well as her limitations within the scope of Listing 12.04 and 12.06, the Court finds there is no evidence of prejudice resulting in either a violation of Ostos' due process rights or the HALLEX. Thus, remand in the aforementioned issue is not warranted.

The Plaintiff's second point of contention is that the ALJ did not develop the record by failing to obtain an electroencephalography ("EEG"). Specifically, the Plaintiff contends the record was incomplete without an EEG to determine whether Ostos' headaches were migraine headaches. The Defendant argues the record was complete and because Ostos was represented by counsel, the ALJ did not have a special duty to make additional inquires into the Plaintiff's medical conditions. Further, the Defendant argues the record confirms the Plaintiff's headaches were linked to her overuse of Excedrin.

"It is well established that the ALJ has a basic duty to develop a full and fair record." Ellison v. Barnhart, 355 F.3d 1272, 1276 (11th Cir.2003). However, "the claimant bears the burden of proving that he is disabled, and, consequently, he is responsible for producing evidence in support of his claim." Id. at 1276. Further, the Eleventh Circuit has concluded that there must be a showing of prejudice before a case will be remanded to the Commissioner for further development of the record. Henderson v. Comm'r of Soc. Sec., 353 Fed. App'x 303, 305 (11th Cir.2009)(unpublished) (citing Brown v. Shalala, 44 F.3d 931, 935 (11th Cir.1995).

In the instant case, while the Plaintiff argues that an EEG was necessary for the ALJ to make an informed decision regarding the Plaintiff's impairments, it is unclear how the absence of an EEG prevented the ALJ from developing a full and fair record. The ME extensively opined that the Plaintiff did not have migraines but simply experienced headaches (R. 55). However, the ALJ concluded that "[n]onetheless, the clinical notes do document severe headaches" and found not only that the Plaintiff suffered from migraines but that they qualified as a severe impairment. (R. 20, 30).

Additionally, despite the designation of the Plaintiff's pain as "headaches" or "migraines," the evidence of record indicates Ostos was being successfully treated and as a result, experienced improvement. As noted by the ALJ, one month before the hearing, while Ostos had been an

17

outpatient at Jackson Memorial Hospital, the Plaintiff had informed attending physician, Dr. Custer, that headaches were well controlled and had improved since she stopped taking NSAIDs (non-steroidal anti-inflammatory drug) and started taking amitriptyline. (R. 23, 500-501). Thus, because the ALJ found that the Plaintiff suffered from migraines, an EEG to prove that Ostos definitively suffered from migraines does not warrant remand of this case for further development by the Commissioner.

The Plaintiff's third point of contention is that the ALJ's Residual Functional Capacity ("RFC") assessment was not based upon substantial evidence. Specifically, the Plaintiff contends the ALJ failed to account for the findings of the ME's findings that the Ostos was limited to light work within the RFC. The Defendant argues the medical record did not support that the Plaintiff had any physical exertional limitations and because the Plaintiff's past relevant work was at a light exertional level, Ostos' argument that the ALJ erred in finding she could perform work at all exertional level was moot.

The RFC is an assessment which is based upon all of the relevant evidence of a claimant's remaining ability to do work despite his impairments. Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997), citing, 20. C.F.R. § 404.1545(a). "The RFC assessment must first identify the individual's functional limitations or restrictions and assess... her work-related abilities on a function by function basis...Only after that may RFC be expressed in terms of exertional levels of work, sedentary, light, medium, heavy, and very heavy." Freeman v. Barnhart, 220 Fed. Appx. 957, 960 (11th Cir. 2007).

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c) and (d) of 20 C.F.R. § 404.1545 and § 416.945. Only after that may RFC be expressed in terms of the exertional levels of work,

sedentary, light, medium, heavy, and very heavy.

SSR 96-8p (4).

In the instant case, the Plaintiff argues that the ALJ erred in according the ME's opinion little weight in the assessment of the Plaintiff's RFC. On the date of the hearing, the ME testified that while he did not believe the Plaintiff would be capable of performing medium level work, she would be capable of performing light exertional work. (R. 61-62). The ALJ addressed the ME's opinion regarding Ostos' exertional limitations and stated the following:

> Upon questioning by the claimant's representative, Dr. Farmati opined that the claimant can perform light work but the evidence, including Dr. Farmati's own testimony that the claimant does not have any physically limiting (exertional) limitations, and that except for the September 2010 MRI showing mild white matter changes in the brain, all her physical examinations were normal, shows that the claimant is not as limited as opined by Dr. Farmati.

(R. 30-31)(citations omitted).

The remainder of the record supports the ALJ's limitation of the aforementioned portion of the ME's testimony. For example, the ALJ referenced, *inter alia*, the medical records of Dr. John Staszel, D.O., who examined the Plaintiff and found she could dress and feed herself, sweep, mop, vacuum, cook, clean dishes, shop and walk upstairs. (R. 426). Additionally, outpatient medical records from Jackson Memorial Hospital from April 2009 through December 2010 document physical examinations that were within normal limits (R. 500-563) with the exception of medical records that indicated the presence of an ovarian cyst and headaches; the latter of which was noted to be the likely result of medication overuse. (R. 55).

An ALJ is "not required to include findings in the hypothetical that the ALJ [has] properly rejected as unsupported." Bouie v. Astrue, 226 Fed. App'x 892, 894 (11th Cir.2007)(unpublished) (quoting Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1161 (11th Cir. 2004). In keeping with

19

the Eleventh Circuit's ruling on the matter, the ALJ found a portion of Farmati's opinion regarding

Ostos' limitations to be unfounded; and posed hypothetical questions to the VE which encompassed

Ostos' limitations that were supported by the record.  Because there was no evidence that the

Plaintiff had any physical limitations, the ALJ correctly concluded that the Plaintiff had a full range

of work at all exertional levels with non-exertional limitations, and therefore, was capable of

performing her past relevant work as a housekeeper at a light exertional level.

In a related argument contained within the Plaintiff's third contention, the Plaintiff argues

the ALJ implicitly relied on the opinion of Dr. Staszel in support of the RFC assessment but failed

to accord the opinion specific weight.

An ALJ is required to consider and explain the weight given to different medical doctors such

as examining and consulting physicians. See, McCloud v. Barnhart, 166 Fed. App'x 410, 419 (11th

Cir.2006).  However, in limited circumstances, the failure of an ALJ to state the weight given to the

medical opinion of a physician may be harmless error. See, Caldwell v. Barnhart, 261 Fed. App'x

188, 191 (11th Cir.2008)(holding the ALJ's failure to state what weight she had accorded to an

examining physician resulted in harmless error because the ALJ had mentioned the physician's

findings within the determination and the findings were not inconsistent with the record).

In the instant case, the findings of Dr. Staszel are consistent with the ALJ's RFC of the

Plaintiff.  Dr. Staszel noted Ostos displayed a good effort upon examination and was able to sit,

stand and walk; hear and speak; and handle and carry objects without restrictions. (R. 429).  Such

findings are consistent with the ALJ's RFC that the Plaintiff had no physical exertional limitations.

Moreover, the Plaintiff does not dispute that the medical opinions of Dr. Staszel are

consistent with the RFC stating, "[i]t can be argued that the ALJ implicitly gave considerable weight

to Dr. Staszel's opinion because the physical examination was normal and he stated there [were] no

limitations with sitting, stand and walking.  That seems to imply an RFC for a full range of work at all exertion levels." (D.E. #21, p.13).  Therefore, because the ALJ considered the opinion of Dr. Staszel and as it is consistent with the ALJ's finding of the Plaintiff's RFC, the Court finds no error is present.

## III.  CONCLUSION AND RECOMMENDATION

Based on the foregoing, this Court finds that the decision of the ALJ was supported by substantial evidence and that the correct legal standards were applied.  Therefore, it is the recommendation of this Court that the decision of the Commissioner be **AFFIRMED**.  Accordingly, the Motion for Summary Judgment filed by the Plaintiff (D.E. #21) should be **DENIED**; the Motion for Summary Judgment filed by the Defendant (D.E. #24) should be **GRANTED**; and FINAL JUDGMENT should be entered in favor of the Defendant, Michael J. Astrue, Commissioner of Social Security and against the Plaintiff, Maria Olga Ostos.

Pursuant to Local Magistrate Rule 4(b), the parties have fourteen (14) days from service of this Report and Recommendation within which to serve and file written objections, if any, with the Honorable Federico A. Moreno, Chief United States District Judge.  Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. Loconte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988); R.T.C. v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND ORDERED** this **20** day of November, 2012.

ROBERT L. DUBÉ
UNITED STATES MAGISTRATE JUDGE